## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | **Chapter 11** |
| **BLACK, DAVIS, and SHUE** | * | |
| **AGENCY, INC.,** | * | |
| Debtor | * | **Case No.:1-06-bk-00051MDF** |
| | * | |
| | * | |
| **BLACK, DAVIS and SHUE** | * | |
| **AGENCY, INC.,** | * | |
| Plaintiff | * | |
| | * | **Adversary No.:1-11-ap-00160MDF** |
| vs. | * | |
| | * | |
| **FRONTIER INSURANCE COMPANY** | * | |
| **IN REHABILITATION,** | * | |
| Defendant | * | |

### OPINION

### I. Introduction

Before me is a motion to dismiss or stay ("Motion") the litigation of certain

counterclaims\setoffs asserted by Black, Davis and Shue Agency, Inc. ("Debtor") against

Frontier Insurance Company in Rehabilitation ("Frontier") in response to claims filed by Frontier

in Debtor's case. For the reasons set forth below, the Motion will be granted in part and denied

in part.

Debtor is an insurance agency located in Harrisburg, Pennsylvania. Prior to 2001,

Frontier was an insurance carrier headquartered in New York whose business included

underwriting lines of workers' compensation insurance. The case before me arises from a

contract executed between Frontier and Debtor in October 2000 (the "Agency Agreement").

Under the terms of the Agency Agreement, Frontier was to underwrite workers' compensation

insurance, and Debtor was to act as its agent by marketing and servicing policies for professional

employer organizations ("PEOs").[1]  The Agency Agreement also involved the creation of an

offshore insurance provider, formed by Debtor's principals and a third party, to reinsure the

policies issued by Frontier.

In the two proofs of claims filed in Debtor's bankruptcy case, Frontier asserts claims for

damages as a result of Debtor's breach of the Agency Agreement.  In the counterclaims filed in

this adversary proceeding, Debtor alleges that it was Frontier, not Debtor, who breached the

Agreement. The claims and counterclaims before me are complicated by the insolvent status of

Frontier, which a New York state court placed into receivership in 2001. On January 3, 2005,

Frontier's receiver, Gregory V. Serio ("Serio" or the "Receiver") filed a lawsuit against Debtor

in the District Court for the Southern District of New York at Case No. 05Civ15(MHD) seeking

damages allegedly sustained as a result of Debtor's breach of the Agency Agreement (hereinafter

"the New York Federal Litigation"). The Receiver filed the action in federal court because of

"the national and international scope of the facts and circumstances" of the case.  (Declaration of

H. Neal Conolly, Case No. 1-06-bk-00051MDF, Docket # 574-7.) Among other allegations,

Frontier alleged that Debtor breached the Agency Agreement by collecting premiums from

clients and failing to remit them to Frontier.  In response, Debtor filed counterclaims against

Frontier alleging that, *inter alia*, Frontier breached the Agency Agreement by failing to audit

premium payments.  Magistrate Judge Dolinger ("Judge Dolinger"), who was assigned to hear

the case, issued an order in October 2005 in which he abstained from deciding Debtor's

---

[1]A PEO provides human resources services to its clients, usually small and medium sized
businesses, including payroll and benefits administration, health and workers' compensation
insurance. Often these services are provided directly to the client's workforce. *Kreidler v. Pixler,*
2006 WL 3539005, *1 (W.D. Wash. December 7, 2006).

2

counterclaims. In December 2005, Judge Dolinger issued a mandatory preliminary injunction requiring Debtor to escrow approximately $1.5 million in premium payments received. In response to the injunction, Debtor filed the within bankruptcy case. Frontier filed two proofs of claim in the case reasserting allegations it alleged as the plaintiff in the New York Federal Litigation. In turn, Debtor filed the above-captioned adversary action reasserting the counterclaims it raised as the defendant in the same litigation.

In the within Motion, Frontier argues alternatively: (1) that Debtor is barred by the *Rooker-Feldman* doctrine from asserting counterclaims against Frontier that are identical to claims stayed by Judge Dolinger in the New York Federal Litigation; (2) that this Court should take judicial notice of the findings in Judge Dolinger's injunction order and bar Debtor under principles of preclusion from relitigating issues decided in that matter; (3) that this Court should adopt Judge Dolinger's reasoning and stay Debtor's counterclaims, other than setoffs for commissions, if any, owed to Debtor; (4) that this Court is stayed from adjudicating Debtor's counterclaims by the general stay of claims issued in the state court receivership; and (5) that some or all of the counterclaims should be dismissed under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) if this Court undertakes a review of Debtor's counterclaims independent of the review conducted by Judge Dolinger.[2]

Resolution of Frontier's Motion requires consideration of the unusual posture of this case. First, the plaintiff in the New York Federal Litigation was the Receiver. His mandate under state law to marshal Frontier's assets for purposes of rehabilitation or liquidation must be

---

[2]In the instant motion, Frontier adopts and incorporates by reference the Rule 12(b)(6) motion that it filed in the New York Federal Litigation.

3

weighed against Debtor's right to reorganize under the Bankruptcy Code.  Second, Judge

Dolinger issued two opinions in which he made findings about the merits of the parties' claims

and determined that certain claims against Frontier should be litigated in the state court

receivership.  In the matter to be decided herein, the parties disagree as to whether this Court is

bound by those findings.  Third, while Frontier's Motion invokes legal principles related to

abstention and comity, additional issues of this Court's constitutional authority to hear Debtor's

counterclaims have arisen as a consequence of the Supreme Court's decision in *Stern v.*

*Marshall*, ___U.S. ___, 131 S. Ct. 2594 (2011), which was handed down while Frontier's

Motion was pending.  Issues presented as a consequence of the *Stern* decision must also be

addressed.

  In the Background below, I will set forth the history of the parties' relationship as it may

be gleaned from the pleadings and discuss the terms of the Agency Agreement to the extent that

they are not disputed.  In the ensuing Discussion, I will address issues of preclusion and comity

that have arisen because of the concurrent proceedings in the Frontier receivership in addition to

the prior decisions issued by Judge Dolinger in the New York Federal Litigation. I also will

assess the impact of the *Stern* decision on the Court's constitutional authority to decide

counterclaims asserted by Debtor.  Finally, I will also consider whether it is appropriate to

dismiss any counts of the Adversary Complaint under Fed. R. Civ. P. 12(b)(6)[3] and whether any

form of abstention is warranted.

---

[3]Fed. R. Civ. P. 12(b)(6) is made applicable to adversary cases in bankruptcy cases  by
Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.")

4

## II. Procedural History

On October 15, 2001, an Order was issued by the Supreme Court of the State of New York, County of New York, (hereinafter "the Rehabilitation Order") appointing the Receiver to take possession of Frontier's assets and attempt to rehabilitate the company. Included in the October 15, 2001 Order was a provision enjoining "all persons . . . from commencing or prosecuting any actions, lawsuits, or proceedings against Frontier or the Superintendent as Rehabilitator." (Motion to Dismiss/Stay Counterclaims, Case No. 1-06-bk-00051MDF, Docket #574, Ex. E-2, p. 16.)

On January 3, 2005, the Receiver filed the New York Federal Litigation for breach of contract. On March 11, 2005, Debtor filed its answer and counterclaims for breach of contract against Frontier. In a Memorandum and Order issued on October 11, 2005, Judge Dolinger stayed the counterclaims in deference to Frontier's ongoing rehabilitation proceedings in state court. *Serio v. Black, Davis & Shue Agency, Inc.*, Case No. 05 Civ 15 (MHD), 2005 WL 2560390 (S.D.N.Y. October 11, 2005) (hereinafter "*Serio I*"). He did not, however, stay litigation of Debtor's claim to set off commissions against premiums collected.[4]

On December 30, 2005, in response to Frontier's petition for a preliminary injunction against Debtor, Judge Dolinger issued a Memorandum and Order compelling Debtor to deposit the sum of $1,491,215.76 into court as a bond against a final judgment. *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05 Civ. 15 (MHD), 2005 WL 3642217 (S.D.N.Y. December 30, 2005).

---

[4]The New York Federal Litigation was closed administratively on February 29, 2007. The last activity on the docket occurred on January 21, 2009 when the parties stipulated to the substitution of the new receiver as the plaintiff in the action.

(hereinafter "*Serio II*").  On January 16, 2006, Debtor filed its bankruptcy petition in order to stay enforcement of the mandatory injunction issued in the New York Federal Litigation.

On April 14, 2006, Frontier filed a proof of claim in Debtor's case in the amount of $3,115,613.  The "Basis for Claim" was described as Debtor's "[b]reach of contract – failure to properly estimate insurance premiums."  On September 9, 2010, Frontier amended the claim, increasing the amount to $4,288,705 to include interest on the damages included in the original proof of claim ("Amended POC 12").  Amended POC 12 further altered the "Basis for Claim" to read "Breach of Contract – See attached."  The Agency Agreement, the New York Federal Litigation complaint, and the *Serio II* preliminary injunction order were attached in addition to a Supplement stating that, *inter alia,* Debtor had "failed to properly calculate, estimate, or formulate the correct amounts of initial premiums due. . . ." (Amended POC 12, Supp.)

On the same date, Frontier filed a second proof of claim, based upon "Breach of Contract – failure to remit funds" in the amount of $2,885,515.  On September 9, 2010, Frontier amended the second claim to include interest on the damages set forth in the original proof of claim ("Amended POC 13"). Amended POC 13 also added language to the "Basis for Claim" statement on the form and attached the Agency Agreement, the New York Federal Litigation complaint, the *Serio II* order, and a Supplement stating that "Debtor improperly and negligently failed to pay [Frontier] all premiums collected, minus its commission and act as trustee and hold all monies collected in a fiduciary capacity." (Amended POC 13, Supp.)

On October 11, 2010, Debtor filed Objections to Amended POC 12 and Amended POC 13.[5] On February 16, 2011, Debtor filed the above-captioned Adversary Complaint, reasserting the counterclaims set forth in its Objections to Frontier's proofs of claim.

Frontier filed the within Motion on March 21, 2011 to which Debtor filed an answer on April 28, 2011. The parties have filed briefs and responsive briefs. Pursuant to an Order issued on June 29, 2011, the parties have also filed briefs on the issue of this Court's constitutional authority to hear this adversary case in light of *Stern*, *supra*. The matter is ready for decision.[6]

### III. Factual Background

*A. The parties and their business relationships*

This case involves the following corporate entities: (1) Debtor, an insurance agency licensed by the Commonwealth of Pennsylvania; (2) Frontier, an insurance carrier licensed by the State of New York and taken into receivership in 2001; and (3) Congressional Re, Ltd. ("Congressional Re"), an off-shore captive insurance company formed to reinsure workers' compensation insurance policies issued by Frontier for qualified PEOs.[7] The matter also involves the following individuals: Timothy Black and Thomas Black ("the Blacks"), who are principals of Debtor, and William Haines ("Haines"), the owner of several Pennsylvania PEOs,

---

[5]These Objections also included the counterclaims filed by Debtor against Frontier in the New York Federal Litigation. Rule 3007(b) of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.") requires that counterclaims be asserted in an adversary proceeding. Debtor subsequently filed the within Adversary Complaint to pursue these counterclaims.

[6]As discussed below, this Court has jurisdiction over the matters raised in the Adversary Complaint pursuant to 28 U.S.C. §§ 157 and 1334. As further discussed below, the matters are core pursuant to 28 U.S.C. § 157(a)(2)(A), (B), (C) and (O).

[7]A captive insurer is a corporation that is created to insure the liabilities of the captive's shareholders or affiliates. *Executive Risk Indem., Inc. v. Charleston Area Medical Center, Inc.*, 681 F. Supp. 2d 694, 702 (S.D. W.Va. 2009).

7

who were Debtor's clients.

In the late 1990s, a reduction in the number of carriers willing to offer workers' compensation insurance made it difficult for PEOs to acquire coverage for their clients. In order to meet the increasing demand, the insurance industry created off-shore captive insurance companies. Captive insurance companies provide access to reinsurance markets, which enables the insuring of risks difficult to cover in the traditional market. *See Coachman Indus. Inc. v. Willis of Ill., Inc.*, 565 F. Supp. 2d 755, 760 n.8 (S.D. Tex. 2008). Because these entities are not licensed carriers in the United States, the captive entity contracts with a licensed provider, known as the "fronting" insurer. "Under a 'fronting' arrangement, a licensed insurer issues a policy with the understanding that another party will reinsure the fronting insurer for most, if not all, of the claims on that policy." *St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co., Ltd.*, No. 96 Civ. 7269(MBM), 1997 WL 357989, at *2 n.3 (S.D.N.Y. 1997) (citation omitted), *quoted in Executive Risk Indem. Inc. v. Charleston Area Medical Center, Inc.*, 681 F. Supp. 2d 694, 702 n.11 (S.D. W.Va. 2009). As compensation for these services, the fronting insurer receives a percentage of the premiums paid into the program.

Debtor markets various types of insurance, including workers' compensation, and has entered into a variety of agency agreements with offshore captives and fronting carriers. Around 1999 Haines approached Debtor for assistance in creating a captive insurance program for the PEOs he owned and operated. In reviewing Haines' proposal, Debtor determined that the program was not feasible due to the small number of policies it would produce. Debtor suggested that the program be expanded to include other PEOs. Exploring this possibility, Haines approached representatives of America's PEO about joining the proposed arrangement.

8

America's PEO agreed with Haines to develop a captive program to benefit their respective

clients. In furtherance of this agreement, Haines and the Blacks established Congressional Re,

an off-shore company organized under the laws of the Bailiwick of Guernsey.[8] Haines and the

Blacks were the exclusive shareholders of Congressional Re, with Haines holding the majority

interest. *Serio II*, 2005 WL 3642217 at *2.

　　　*B. The Agency Agreement*

　　　As referenced above, Debtor solicited Frontier to serve as the fronting carrier and to issue

policies for Congressional Re. The negotiations that ensued culminated in the execution of the

Agency Agreement on October 1, 2000. Relevant provisions of the Agency Agreement are set

forth in the Appendix. [1]

　　　In *Serio II*, Judge Dolinger determined that:

> the specific responsibilities assigned to Debtor included locating potential
> insureds, binding and writing policies, and handling the necessary paperwork.
> [Debtor] was also required to collect premiums and transmit them to [Frontier],
> less a ten-percent commission. The agreement specifically provided that, in
> undertaking these activities, [Debtor] was acting as a trustee and fiduciary for
> [Frontier], and . . . was required to place the proceeds of the premiums in a special
> account for the benefit of [Frontier] and . . . pay to [Frontier] all premiums due
> under the policies, whether collected or not. The contract further provided that
> the proceeds belonged solely to [Frontier] and that [Debtor] was not to apply
> these funds for its own purposes.

*Id*. at *4.

---

[8]Guernsey is a Dependency of the British Crown located in the English Channel thirty
miles from the French coast. *See* States of Guernsey, The Official Guernsey Government
Website, www.gov.gg/ccm/navigation/about-guernsey, last visited January 16, 2012.

At about the same time the Agency Agreement was executed, Frontier entered into an agreement with Congressional Re. The reinsurance agreement provided that the captive would reinsure policies fronted by Frontier in exchange for which Frontier would pay Congressional Re a premium based upon a percentage of the premiums received from insureds participating in the program. *Id.* at *5.

In August 2000, Debtor submitted a proposal whereby Frontier would insure 52 client companies of America's PEO effective October 1, 2000, which was accepted by Frontier. At about the same time, however, Frontier rejected several applications filed by PEOs owned by Haines. The parties dispute whether Frontier approved any other applications submitted by Debtor for the PEO Program.

In the course of performing its obligations under the Agency Agreement, Debtor received premium payments from approved Program insureds in the amount of at least $3,651,935.79. Of these funds, it remitted only $597,000 to Frontier. *Id.* at *4, *10. Its failure to remit the remainder of these funds constituted a breach of the Agency Agreement. Debtor transmitted approximately half of the funds that it retained – $1,563,720.03 – directly to Congressional Re. *Id.* No provision in the Agency Agreement authorized Debtor to transmit premiums directly to the captive insurer. *Id.*

## C. The New York Federal Litigation

The complaint filed by Frontier in the New York Federal Litigation included three counts. The first count alleged that although Frontier had performed all of its obligations under the Agency Agreement, Debtor had breached the contract by "failing to remit to Frontier all premiums that were or should have been collected on policies issued as part of the Program . . .

10

." (Receiver's Complaint ¶ 173, New York Federal Litigation). The second count alleged that Debtor breached "an implied covenant of good faith . . . compelling [Debtor] to refrain from engaging in conduct that would destroy or injure Frontier's right to obtain the benefit of the parties' contractual relationship." (Receiver's Complaint ¶ 177, New York Federal Litigation). The third count alleged that Debtor breached fiduciary duties toward Frontier by "its overall mismanagement of the Program, failure to guard against the use of the Program as a 'cover' for [fraud]" and failure to remit premiums to Frontier as described in the first count. (Receiver's Complaint ¶ 181, New York Federal Litigation).

In its complaint, Frontier asserted that when it agreed to "proceed with the America's PEO application, Frontier emphasized that [Debtor] would have to commit to adhering strictly to the Program's underwriting guidelines if Frontier's support for the Program was to continue." (Receiver's Complaint ¶ 58, New York Federal Litigation). Although Frontier appointed Debtor "to act on its behalf in the procuring, [sic] and servicing of policies of Workers' Compensation Insurance" through the Agency Agreement, "Frontier retained sole authority to underwrite the workers' compensation business written under the Program." (Receiver's Complaint ¶ 63, New York Federal Litigation). The Receiver further alleged in the complaint that "only Frontier could 'authorize insureds to be added to' the Program provided certain underwriting conditions were met." (Receiver's Complaint ¶ 64, New York Federal Litigation).

According to the Receiver, in disregard of the provisions of the Agency Agreement, Debtor either failed to prevent fraud or actively engaged in fraud when it added new PEOs to the Program or otherwise bound Frontier to pay the claims of entities that "fell outside the

11

Program's guidelines.'"[9] (Receiver's Complaint ¶ 108, New York Federal Litigation). Thus, one element of the Receiver's claim is the recovery of pay outs on policyholder claims that Frontier was required to make as a consequence of Debtor's wrongful acts in binding insurance for entities outside Program guidelines. The Receiver also seeks to recover the amount of premiums collected from approved insureds under the America's PEO Program that Debtor failed to forward to Frontier.

### D. Debtor's Adversary Complaint

In Count I of the Adversary Complaint, Debtor alleges that Frontier breached the Agency Agreement by failing to "properly and adequately perform its contractual obligations" including its failure to audit premium payments from insureds under the Program. (Adversary Complaint ¶ 129, Case No. 1-11-ap-00160MDF). Debtor asserts that because of Frontier's breach, the Program failed to collect between $8 million and $12 million in premium payments. If true, Debtor was deprived of between $800,000 and $1.2 million in commissions that it otherwise would have earned had the breach not occurred.

In Count II, Debtor alleges that Frontier "owed [Debtor] a duty of care in providing insurance services as part of the PEO Program." (Adversary Complaint ¶ 135, Case No. 1-11-ap-00160MDF). It further alleges that Frontier:

> breached its duty by, *inter alia*, failing to issue the workers' compensation policies, requesting duplicate payments from [Debtor] and the policyholder, demanding incorrectly-calculated premium payments from [Debtor], failing to

---

[9]Under New York state law, until it completes an assessment of risk, an insurance carrier is required to pay claims of persons or entities for whom the carrier's agent has bound insurance. *Springer v. Allstate Life Ins. Co. of New York*, 731 N.E.2d 1106, 1108 (2000) (insurance binder provides interim insurance that "is limited in time until an assessment of risk is completed by the carrier.")

12

notify [Debtor] of the unauthorized and fraudulent activity in connection with [certain PEO] accounts, failing and refusing to cooperate and coordinate with [Debtor], and by failing or negligently performing the premium audits on the PEO accounts.

(Adversary Complaint ¶ 135, Case No. 1-11-ap-00160MDF).

In Count III, Debtor alleges that Frontier owed a fiduciary duty to Debtor arising out of the fronting services it provided in the America's PEO Program. Debtor alleges that Frontier breached this duty by "engag[ing]in self-interested dealings that harmed [Debtor]," although Count III does not describe the alleged self-interested dealings in any detail or describe the harm that resulted. (Adversary Complaint ¶ 143, Case No. 1-11-ap-00160MDF).

In Count IV, Debtor asserts that Frontier's "overall mismanagement of the Program, failure to guard against the misuse of or fraud against the Program and failure to properly conduct the audits and provide a claim report to [Debtor] . . . materially breached [an] implied covenant" of good faith and fair dealing. As a result, Debtor alleges that Frontier is liable "[f]or commissions owed on the amount of premiums that should have been collected on the audit . . . ." (Adversary Complaint ¶ 150, Case No. 1-11-ap-00160MDF).

In Count V, Debtor asserts that it "provided benefits to Frontier including . . . business acumen and brokerage services" and that Frontier retained these benefits by collecting premiums under the PEO Program that were never "properly reconciled or offset against the premiums demanded from [Debtor] or on which proper commissions due [Debtor] have not been calculated." (Adversary Complaint ¶ 151 - 52, Case No. 1-11-ap-00160MDF). Debtor alleges that Frontier would be unjustly enriched if permitted to retain these benefits without compensating Debtor.

13

Debtor asserts promissory estoppel in Count VI and avers that Frontier "made clear and unambiguous promises" to Debtor upon which Debtor foreseeably relied. (Adversary Complaint ¶ 155, Case No. 1-11-ap-00160MDF). Debtor does not identify these promises other than to generally reference the preceding 154 numbered paragraphs in the Adversary Complaint. Debtor estimates that it lost between $800,000 and $1.2 million in commissions because of its reliance on Frontier's promises.

In Count VII, Debtor charges Frontier with negligent and intentional misrepresentation. While the Adversary Complaint sets forth the nominal elements of a cause of action for misrepresentation, it does not cite the exact representations made by Frontier or describe how they were erroneous, misleading, or fraudulent.

In Count VIII, Debtor avers that in the course of the business relationship between the parties, "Frontier began a wanton, deliberate and outrageous campaign to misrepresent the honesty and integrity of [Debtor] and its employees in the insurance business community through promulgation of false, defamatory information concerning [Debtor]." (Adversary Complaint ¶ 169, Case No. 1-11-ap-00160MDF).

E. *Frontier's Motion to Dismiss\Stay the Adversary Proceeding*

On February 16, 2011, Debtor filed the instant adversary case, and on March 21, 2011, Frontier moved to dismiss or stay the proceeding. Frontier argues that this Court should adopt Judge Dolinger's reasoning in *Serio I* and abstain from ruling on Debtor's counterclaims. In *Serio I* Judge Dolinger held that *Burford* abstention principles militated in favor of allowing the state rehabilitation court to have control over all claims asserted against Frontier except setoff

14

claims for commissions. *Serio I*, 2005 WL 2560390 at *3 ("[T]he New York regulatory

framework for supervising the insurance industry and, most pertinently, for rehabilitating and

liquidating failing insurance carriers is an administrative process meriting *Burford* abstention in

appropriate circumstances.") (citations omitted).[10]

     Debtor's response to Frontier's argument is that this Court is not obligated to follow the

reasoning in *Serio I* on the abstention issue. To the contrary, Debtor argues that its

counterclaims should be heard here because this Court, unlike the District Court for the Southern

District of New York, "is charged with essentially the same duties as the . . . court in the

Receivership/Liquidation action – marshaling assets, paying or compromising claims, and

otherwise overseeing the affairs of a distressed company . . . ." (*See* Debtor's Brief in

Opposition to Frontier's Motion to Dismiss, Case No. 1-06-bk-00051MDF, Docket #589, p. 11).

Frontier acknowledges that there are no grounds to dismiss or stay Debtor's claims in the matter

before me to the extent that they are setoffs and not counterclaims. (*See* Reply Memorandum of

Frontier, Case No. 1-06-bk-00051MDF, Docket #594, pp. 8-9.) Debtor asserts that all of the

---

    [10]The *Burford* doctrine provides that:

> [w]here timely and adequate state-court review is available, a federal court sitting
> in equity must decline to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are "difficult questions of state law
> bearing on policy problems of substantial public import whose importance
> transcends the result in the case then at bar"; or (2) where the "exercise of federal
> review of the question in a case and in similar cases would be disruptive of state
> efforts to establish a coherent policy with respect to a matter of substantial public
> concern."

*New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989), *quoted in*
*Baykeeper v. NL Ind., Inc.*, 660 F.3d 686, 692-93 (3d Cir. 2011) (other citations omitted).

15

issues pertinent to the counterclaims will have to be addressed in connection with deciding the setoff claims, so requiring the counterclaims to be heard in the receivership action would be inefficient for the parties and a waste of judicial resources. (Debtor's Brief in Opposition to Frontier's Motion to Dismiss, Case No. 1-06-bk-00051MDF, Docket #589, p. 12). Debtor further contends that "abstaining would result in two different courts hearing the same evidence to reach essentially the same exact resolution – one as a setoff and the other as an affirmative claim" with the concomitant possibility of inconsistent rulings from those courts. (Debtor's Brief in Opposition to Frontier's Motion to Dismiss, Case No. 1-06-bk-00051MDF, Docket #589, p. 13).

## IV. Discussion

*A. Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)*

The motion before me is styled as one to dismiss or stay the proceeding. Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under Rule 12(b)(6), a court must treat the facts alleged in the complaint as true, construe the complaint in the light most favorable to the non-moving party, draw all reasonable inferences that can be drawn therefrom in favor of the non-moving party, and ask whether, under any reasonable reading of the complaint, the non-moving party may be entitled to relief. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1410 (3d Cir.), *cert. denied*, 111 S. Ct. 2839 (1991). The court need not determine if the non-moving party ultimately will prevail, but only whether the plaintiff is entitled to relief under any set of facts that could be proved consistent with the properly pleaded allegations of the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

16

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, ___,129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 129 S. Ct. at 1948-49. Although a complaint need only consist of a "short and plain statement of the claim showing that the pleader is entitled to relief," to survive a motion to dismiss, it must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).

*Iqbal* established a two-step process to determine whether relief should be granted under Rule 12(b)(6).  A court must first identify pleadings that are conclusory and, therefore, not entitled to a presumption of truth.  Second, a court must assume that well-pleaded factual allegations are true.  Examining the factual allegations alone, the court must then determine whether those allegations give rise to a plausible claim for relief.

This Court's jurisdiction to dismiss any count of Debtor's Adversary Complaint under Rule 12(b)(6) is necessarily dependent on its constitutional authority to hear the matter. Accordingly, in the discussion below regarding the constitutional authority of this Court to enter judgment on each count of the Adversary Complaint, I will also address the merits of Frontier's motion to dismiss under Rule 12(b)(6).

### B.  Impact of <u>Stern v. Marshall</u> on Debtor's counterclaims

Before a court hears a matter, it not only must ensure that it has subject matter jurisdiction, but also that it possesses constitutional authority to decide an issue. As outlined

above, this proceeding involves multiple causes of action arising from a transaction that, in the

absence of Debtor's bankruptcy case, would have been heard in a state forum. The New York

state court supervising Frontier's rehabilitation has statutory authority under state law to resolve

claims against Frontier.[11] This Court has statutory authority under 28 U.S.C. § 157(b)(2) to

allow or disallow claims against Debtor as well as counterclaims asserted by Debtor against

these same claimants. Core matters that this Court has the constitutional authority to hear may

be decided by this Court. Therefore, I first must determine if any constitutional impediment

exists to adjudication of Debtor's counterclaims in bankruptcy court.

### 1. Federal bankruptcy court jurisdiction v. state receivership jurisdiction

A federal bankruptcy court and a state insurance receivership court have similar

responsibilities and jurisdictional foundations. Both exercise *in rem* jurisdiction over assets of a

troubled or insolvent entity and are charged with the responsibility of equitably distributing the

assets of the estate to creditors in accordance with a prescribed statutory scheme.[12]

When a debtor files for bankruptcy protection, causes of action that belong to a debtor at

the time the petition is filed become property of the estate under 11 U.S.C. § 541. *In re*

*Furgeson*, 263 B.R. 28, 33-34 (Bankr. N.D. N.Y. 2001) (property of the estate includes causes of

action accruing to debtor and claims by debtor against third parties) (citing *U.S. v. Whiting*

*Pools, Inc.*, 462 U.S. 198, 204-05 (1983)). Although not disclosed by Debtor in the schedules

---

[11]The task of supervising the rehabilitation or liquidation of a domestic insurance carrier is left to state courts under the authority of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1012 (1945).

[12]*See* William Carlisle Herbert, *When Jurisdictions Collide: Determining Judicial Roles when Bankruptcy Court and Insurance Receivership Court Responsibilities Overlap*, 42 Tort Trial & Ins. Prac. L. J. 941, 942 (Summer 2007).

18

when the bankruptcy petition was filed, the causes of action Debtor is asserting against Frontier

in its counterclaims to Frontier's claims became assets of the bankruptcy estate on the date of the

petition.

States are similarly concerned about protecting the assets of insurance companies in

receivership. The state court supervising the rehabilitation or liquidation of the company

typically enters an injunction order barring creditors from pursuing claims against the insurer in

venues outside the receivership court. These injunctions, however, do not prevent parties from

pursuing *in personam* actions in the bankruptcy court. In *Gross v. Weingarten*, 217 F.3d 208 (4th

Cir. 2000), the Court of Appeals for the Fourth Circuit explicitly held that a receivership court

cannot create an exclusive forum for hearing claims against an insurer in receivership. *Id.* at 221.

"An attempt to restrain the exercise of federal jurisdiction is no more effective when made by a

court in the form of an injunction." *Id.* When a party merely seeks an adjudication of a claim

against a fund in the possession of a state court, there is no danger of conflict because settling the

existence and amount of a claim does not disturb the "possession of the liquidation court, in no

way affects title to the property, and does not necessarily involve a determination of what

priority the claim should have." *Id.* (quoting *Morris v. Jones*, 329 U.S. 545, 549 (1947)).

Allowance of a counterclaim against a creditor insurance company does not disturb the state

receivership scheme. If a bankruptcy court allows a debtor's counterclaim against an insolvent

insurer, the debtor must still file its claim with the receivership court to participate in the

distribution of the insurer's assets. The debtor's claim would not interfere or impair the

receivership proceedings because it would be satisfied subject to the terms of the state-approved

rehabilitation plan and state law. *Hawthorne Savings F.S.B. v. Reliance Ins. Co. of Ill.*, 421 F.3d

835, 842-43 (9th Cir. 2005), *opinion amended*, 433 F.3d 1089 (9th Cir. 2006) (citing *Gross*, 217 F.3d at 222). *See also*, *Logan v. Credit Gen. Ins. Co. (In re PRS Insurance Group, Inc.)*, 331 B.R. 580, 586 (Bankr. D. Del. 2005) ("Jurisdiction to consider a proof of claim submitted by a creditor includes jurisdiction to determine all defenses to that proof of claim, including affirmative counterclaims that may be set off against the claim.")

Congress has been empowered by Article I of the U.S. Constitution to create bankruptcy courts to hear and decide cases under federal bankruptcy law. The subject matter jurisdiction of the bankruptcy courts is defined in sections 157 and 1334 of title 28. 28 U.S.C. §§ 157, 1334. District courts have original but not exclusive jurisdiction over civil proceedings arising under title 11, arising in, or related to cases under title 11. 28 U.S.C. § 1334(b). As authorized by § 157(a), a district court may refer these cases to the bankruptcy court. 28 U.S.C. § 157(a). Cases or proceedings that "arise under" or "arise in" a bankruptcy case are considered "core" matters. A list of core matters is codified in § 157(b)(2) of title 28, which includes "the estimation and allowance or disallowance of claims against a debtor estate." 28 U.S.C. § 157(b)(2)(B). Also listed as core matters are "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C). "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir. 1984).

The allowance and disallowance of claims is within the exclusive jurisdiction of the bankruptcy courts. *Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992). By filing a proof of claim, a creditor becomes a party under a bankruptcy court's core

20

jurisdiction. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) (holding that when a party files a proof of claim with the bankruptcy court, it consents to the court's jurisdiction to make a final decision as to the claim); *see also Exide Technologies*, 544 F.3d 196, 214 (3d Cir. 2008); *cf Stern*, 131 S. Ct. at 2616 ("[H]e who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure.") (quoting *Katchen v. Landy*, 382 U.S. 323, 333 (1966)).

Following the *Stern v. Marshall* decision, however, the determination of whether a bankruptcy court possesses the constitutional authority to adjudicate a counterclaim brought by the debtor against the claimant is less clear, notwithstanding the specific statutory authority provided by § 157(b)(2)(C) to hear these actions.

### 2. Bankruptcy courts' constitutional authority to hear "core" matters

#### a. Analysis of <u>Stern v. Marshall</u>

In *Stern* the Supreme Court held that a bankruptcy court lacks "constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* 131 S. Ct. at 2620. The Court held that 28 U.S.C. § 157(b)(2)(C) is unconstitutional because it gives non-Article III judges the power to render final judgment on common law compulsory counterclaims.

The factual context in which the issue in *Stern* emerged involved two separate and conflicting courses of litigation – one in a Texas probate court and the other in a bankruptcy court in California. The probate litigation was initiated first when Vickie Marshall ("Vickie") sued her stepson, Pierce Marshall ("Pierce"), alleging that he had engaged in fraud and had unduly influenced the decision of his father, Howard Marshall, to exclude Vickie from his

21

probate estate. After Vickie filed for bankruptcy protection, Pierce filed a proof of claim in her

case seeking monetary damages for defamation. In response, Vickie asserted a cause of action

for tortious interference as a counterclaim to the proof of claim filed by Pierce in her case. After

the bankruptcy court granted judgment in Vickie's favor on the counterclaim and disallowed

Pierce's claim, he appealed to the district court. While the appeal was pending, Vickie's suit in

the Texas probate court proceeded, resulting in a verdict for Pierce. On appeal from the district

court, the Court of Appeals for the Ninth Circuit held that the bankruptcy court lacked core

jurisdiction over Vickie's counterclaim. Therefore, ruled the Ninth Circuit, the district court was

required to give the first-in-time Texas judgment preclusive effect.

On certiorari to the Supreme Court, Chief Justice Roberts, writing for the majority,

concluded that a bankruptcy court "lack[s] the constitutional authority to enter a final judgment

on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of

claim." *Id.*, 131 S. Ct. at 2620. The critical question, according to the Court, is whether the

counterclaim "stems from the bankruptcy itself or would necessarily be resolved in the claims

allowance process." *Id.* As to the bankruptcy court's jurisdiction over the defamation claim

filed by Pierce, the Court ruled that Pierce's filing of the proof of claim effectively waived his

right to contest bankruptcy jurisdiction although the cause of action on which the claim was

based was a "personal injury tort" subject to the terms of 28 U.S.C. § 157(b)(5), which states that

these claims must be tried in district court.[13]

---

[13]Section 157(b)(5) provides that "[t]he district court shall order that personal injury tort
and wrongful death claims shall be tried in the district court in which the bankruptcy case is
pending, or in the district court in the district in which the claim arose, as determined by the
district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5).

22

The *Stern* decision has been examined by numerous courts. Two lines of reasoning have developed as to a bankruptcy court's constitutional authority to enter final judgment when it hears matters that are described as "core" under 11 U.S.C. § 157(b), but that do not involve "public rights" as defined by the Supreme Court.[14] The first approach finds that *Stern* has only a minor impact on a bankruptcy court's ability to enter final judgment in matters falling within the jurisdictional confines of 28 U.S.C. § 157.

> The Supreme Court's holding in *Stern* was very narrow. The Supreme Court merely held that Congress exceeded its authority under the Constitution in one isolated instance by granting bankruptcy courts jurisdiction to enter final judgments on counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim. Nothing in *Stern* limits a bankruptcy court's jurisdiction over other "core" proceedings.

*In re Safety Harbor Resort and Spa*, 456 B.R. 703, 705 (Bankr. M.D. Fla. 2011); *see also In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698-99 (Bankr. N.D. Ill. 2011) (*Stern* does not imply that bankruptcy courts cannot decide state law issues); *In re Ambac Financial Group, Inc.*, 457 B.R. 299, (Bankr. S.D. N.Y. 2011) ("*Stern v. Marshall* has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court."); *Oxford Expositions, LLC v. Questex Media Group, LLC (In re Oxford Expositions, LLC)*, 2011 WL 4074028, *9 (Bankr. N.D. Miss. September 13, 2011) ("The *Stern* opinion does abrogate the authority of a bankruptcy court to enter a judgment on a state law

---

[14]The Supreme Court stated in *Stern* that Article III of the Constitution prohibits Congress from limiting "judicial cognizance" of a suit brought under "common law, or in equity, or admiralty." *Stern*, 131 S. Ct. at 2609, *quoting Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1856)). However, Congress may assign certain categories of cases to courts created under Article I when they involve "public rights." These rights arise under or are closely connected to a federal regulatory scheme. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51 n. 8 (1989), *citing Crowell v. Benson*, 285 U.S. 22, 50 (1932).

23

counterclaim that by necessity must be resolved in the process of ruling on the creditor's proof of claim.").

The second approach views the decision as having broader constitutional implications, finding that the decision significantly limits a bankruptcy court's constitutional authority to adjudicate claims that arise outside the Bankruptcy Code. *See, e.g., Ortiz v. Aurora Healthcare, In*c., No. 10-3465, ___ F.3d ___, 2011 WL 6880651 (7th Cir. December 30, 2011) (holding that the bankruptcy court lacked authority to enter final judgment on debtors' counterclaim that medical provider creditor violated Wisconsin confidentiality law by attaching unredacted copies of debtors' medical records to proofs of claim – counterclaim outside claims resolution process).

In deciding the matter before me, I am inclined to follow those courts which have concluded that *Stern* was decided narrowly and should have a limited impact on a bankruptcy courts' authority to enter a final decision on a matter. I find significant that Chief Justice Roberts stated that the holding in *Stern* is narrow, opining that the decision is unlikely to have significant practical consequences beyond invalidating in "one isolated respect" a statutory grant of authority in which 28 U.S.C. §157(b)(2)(C) exceeded Congress' powers under the Constitution. *Stern*, 131 S. Ct. at 2619-20. The majority in *Stern* observed that "[w]e do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute. . . ." *Stern*, 131 S. Ct. at 2620. I agree with the conclusions of other courts which have found *Stern* "replete with language emphasizing that the ruling should be limited to the unique circumstances of that case . . . ." *In re Heller Ehrman LLP*, 2011 WL 4542512, *5 (Bankr. N.D. Cal. July 18, 2011); *In re AFY, Inc.*, ___ B.R. ___, 2012 WL 98510, *4 (B.A.P. 8th Cir. January 13, 2012) ("[T]he Supreme Court itself has

24

cautioned that its holding is a narrow one, affecting only this one small part of the bankruptcy judges' authority. Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word. . . .") (footnote omitted).

As indicated above, the test prescribed by *Stern* for determining whether a bankruptcy court has constitutional authority to issue a final order adjudicating a debtor's state law counterclaim against a bankruptcy claimant is whether the counterclaim "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2620. In the matter before me, the counterclaims do not stem from the bankruptcy case. Therefore, the issue here is whether the counterclaims would necessarily be resolved in the claims allowance process. Before this determination can be made, however, a threshold question must be addressed. To meet the requirements of *Stern*, must a bankruptcy court be certain that a counterclaim necessarily will be resolved in the adjudication of the claim before it has an opportunity to hear evidence at trial?

The phrase "would necessarily be resolved in" has not been construed directly by any court post-*Stern*. The phrase is substantially similar to the phrase "actually and necessarily decided" that has been employed by some courts addressing issue preclusion. Issue preclusion may be applied if the issue in question was actually and necessarily decided in a prior proceeding. *Vargas v. City of New York*, 377 F.3d 200, 206 (2d Cir. 2004) (citations omitted); *Carter v. AMC, LLC*, 645 F.3d 840, 842 (7th Cir. 2011); *Scrivner v. Mashburn (In re Scrivner)*, 535 F.3d 1258, 1266 (10th Cir. 2008). Although the two phrases are similar, cases construing the term "actually and necessarily decided" in the context of issue preclusion are of little utility here. A court considering whether issue preclusion applies in a case has the benefit of hindsight

25

– it can read the findings and conclusions of the prior proceeding and determine with certainty whether an issue was decided or not. Application of the phrase "would necessarily be resolved in the claims allowance process" requires the court to predict how the evidence will be developed to substantiate both the creditor's claim and the debtor's counterclaim, a more difficult undertaking if the pleadings do not make clear the connections between the two.

A more apt analogy may be found in cases dealing with issues of federal question jurisdiction where a civil defendant seeks to remove a case from state to federal court based on the existence of a federal question in the complaint. Cases dealing with the "substantial federal question doctrine" have held that "a defendant seeking to remove a case in which state law creates the plaintiff's cause of action must establish . . . that the plaintiff's right to relief *necessarily depends on* a question of federal law . . . ." *Dixon v. Coburg Dairy, Inc.,* 369 F.3d 811, 816 (4ᵗʰ Cir. 2004) (emphasis added). Resolving an issue of federal question jurisdiction requires a court to examine the existing pleadings and determine whether the record, when fully developed, will create a right to relief that necessarily depends on federal law.

The phrase "necessarily depends on" as used in federal question doctrine cases has been narrowly construed. "A plaintiff's right to relief for a given claim 'necessarily depends on' a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue." *Dixon,* 369 F.3d at 816 (emphasis in original, internal quotations added). "[I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist." *Mulcahey v. Columbia Organic Chemicals Co., Inc.,* 29 F.3d 148, 153 (4ᵗʰ Cir. 1994). Applying the guidance of the *Dixon* court, if Debtor's counterclaim

26

could be resolved without considering Frontier's claim, then this Court has no constitutional authority to hear the counterclaim.

Without specifically construing the phrase from *Stern*, several bankruptcy courts have held that counterclaims which may be prosecuted independent of a creditor's claim cannot be finally decided by a bankruptcy court. In *In re Olde Prairie Block Owner, LLC,* a creditor filed a proof of claim for damages suffered as a consequence the debtor's default on a loan contract. After examining several counts of the debtor's counterclaim, the bankruptcy court opined that two of the counts were in the nature of affirmative defenses to the alleged contract default and, thus, would necessarily be resolved in adjudicating the creditor's claim. *In re Olde Prairie Block Owner, LLC,* 457 B.R. 692, 698-99 (Bankr. N.D. Ill. 2011). Three of the counts, however, required legal and factual determinations separate from [the creditor's] contract claim; thus, they were independent of the creditor's claim. *Id.* at 699. Deciding that in the absence of consent it had no constitutional authority to enter judgment on these three counterclaims, the bankruptcy court observed that, "determining enforceability of a contract . . .is different from deciding . . . whether the parties owed each other duties under state law that were independent of the contract and whether those duties were breached." *Id*.; *See also In re Oxford Expositions, LLC*, 2011 WL 4074028 at *9 (holding that where state law counterclaims are "inextricably tied" to a creditor's proof of claim a bankruptcy court may enter final judgment under *Stern*).

Therefore, I must first determine whether any of the counts asserted by Debtor in its counterclaim exist independently of Frontier's claims or, to the contrary, are inextricably tied to the claims. If I conclude that this Court lacks constitutional authority to adjudicate any particular count of the Adversary Complaint and there is no other reason to decline to hear the count, I will

27

make findings of fact and conclusions of law for entry of judgment by the District Court. As noted above, even if I have constitutional authority to adjudicate certain counts, I also must determine whether they are subject to dismissal under Rule 12(b)(6).

### b.  Application of the _Stern_ test

In the matter before me, Debtor asserts eight counterclaims against Frontier, all of which were asserted by Debtor pre-petition in the New York Federal Litigation.  As I have previously stated, none of the counterclaims stem from the bankruptcy itself.  Accordingly, I must determine whether each count of Debtor's Complaint would necessarily be resolved within the claims allowance process.

Frontier has couched its claims in broad language asserting damages due to Debtor's alleged misfeasance in dealing with premiums under the PEO Program. Amended POC 12 primarily addresses Debtor's alleged failure to properly calculate the correct amount due on initial premiums, while Amended POC 13 primarily addresses Debtor's alleged failure to hold premiums in a fiduciary capacity and to remit them to Frontier.  Despite that difference, both proofs of claim assert damages for various alleged breaches of the Agency Agreement and other claims delineated in the New York Federal Litigation.

### (1).  Count I – breach of contract

In Count I, Debtor alleges that Frontier breached the Agency Agreement by failing to perform its contractual obligations, including its responsibility to audit premium payments received from insureds.[15] In Sections Four and Eight of the Agreement, Debtor agreed to collect

---

[15]In addition to the specific allegation that Frontier failed to perform premium audits as required under the amended Agency Agreement, Debtor also makes general allegations asserting that Frontier failed to cooperate with Debtor and to provide information Debtor needed in order

28

premiums and hold them in a fiduciary capacity for Frontier. Under Section Eight, Debtor

agreed that the premiums were Frontier's property and that Debtor had no interest in the

premiums beyond the ten percent commission authorized under Section Fifteen. In Section

Eight, Debtor further agreed to bear the burden of collecting premiums and to remit them to

Frontier "*whether collected or not*." (emphasis added). Debtor's obligations under the

Agreement continued even after Frontier ceased writing new business.

Debtor asserts that contrary to the terms of the Agreement, in March 2003 the parties

agreed that Frontier, not Debtor, would perform premium audits of policies issued to PEO

clients. (Adversary Complaint, ¶¶ 99-119).[16] Debtor admits that under the Agency Agreement it

was responsible for conducting the "initial audits" of premiums, which considered the size of the

PEO's annual payroll. Because the exact amount of an annual payroll was not known at the

beginning of the year, Debtor's "initial audit" was only an estimate. A "final audit" was required

at the end of the year to determine the exact amount of premium due. Debtor alleges that after

the Agency Agreement was amended Frontier was responsible for conducting these "final"

audits and failed to do so. As a consequence, between $8 million and $12 million in premium

payments were not collected from insureds due to Frontier's alleged breach.[17]

Debtor's argument that Frontier's letter constituted an amendment to the Agreement and

that Frontier failed to perform audits as required by the amended Agency Agreement are factual

---

to perform under the Agency Agreement.

[16]According to the Adversary Complaint, this amendment to the Agreement was
memorialized in a letter from Debtor to Frontier dated February 7, 2003.

[17]The damages sought by Debtor in Count I are the commissions that it should have
received on whatever premium amounts Frontier should have collected but did not.

29

averments that must be accepted as true under Rule 12(b)(6) when considering Frontier's Motion to Dismiss. *See Kehr Packages, supra.*[18] Debtor's claim that Frontier breached the Agreement by failing to audit premiums will necessarily be resolved in the litigation of Debtor's objection to Frontier's proof of claim for damages, at least to the extent that Frontier's claim is based on premiums Debtor was prevented from calculating and collecting because Frontier failed to conduct a final audit.

Under New York law, a party to contract cannot sue for "failure of another to perform when he has frustrated or prevented the performance." *Hidden Meadows Dev. Co. v. Parmelee's Forest Prods.*, 734 N.Y.S.2d 264, 266 (2001); *accord Kooleraire Serv. & Installation Corp. v. Board of Educ. of City of N.Y.*, 28 N.Y.2d 101, 106 (1971) (party to a contract cannot rely on failure of another to perform a condition precedent when he has prevented occurrence of the condition). If Debtor is able to prove that Frontier's actions or inactions made it impossible for Debtor to collect some of the premiums owed, then Debtor's performance under the Agency Agreement may be partially excused.[19]  Based on these alleged facts, Debtor's counterclaim will

---

[18]In the New York Federal Litigation, Judge Dolinger found that the Agency Agreement was amended to shift Debtor's responsibility to conduct audits to Frontier. See footnote 27, *infra.*

[19]To the extent that Frontier's claims are based on unremitted premiums that were *not* subject to a final audit, however, the outcome is determined by the consideration of preclusion principles discussed later in this Opinion. Because I find that Debtor is precluded by the findings in Judge Dolinger's order from arguing that amendments to the Agency Agreement authorized Debtor to disburse premiums to Congressional Re, Debtor was required to comply with the terms of the Agency Agreement as to the remittance of *all* premiums received, including those not subject to final audit.

30

necessarily be resolved in the claims litigation process, and this Court has constitutional authority to issue a final judgment on Count I.[20]

### (2). Count II – negligence

In Count II, Debtor alleges that Frontier "owed [Debtor] a duty of care in providing insurance services as part of the PEO Program." It then alleges that Frontier breached this duty by failing to issue workers' compensation policies, by requesting duplicate payments from Debtor and policyholders, by "demanding incorrectly-calculated premium payments" from Debtor, by failing to notify Debtor of "unauthorized and fraudulent activity" in connection with certain PEO accounts, by failing to work with Debtor in administering the Program, and by "failing or negligently performing the premium audits on the PEO accounts." (Adversary Complaint, ¶ 135.) Debtor's count for negligence sounds in breach of contract as previously alleged in Count I. "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated[.]" *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987). Because the allegations in Count II simply recite another version of its breach of contract claim, Count II must be dismissed. *Board of Managers of Woodpoint Plaza Condominium v. Woodpoint Plaza LLC*, 901 N.Y.S.2d 897 (Table), 2009 WL 2432346, *5 (N.Y. Sup. August 10, 2009) (negligence claim dismissed because it duplicated substance of breach of contract claim) (citing *Clark-Fitzpatrick, Inc.,* 70 N.Y.2d at 389).

---

[20]To illustrate, if Frontier establishes that it holds a claim against Debtor for $2 million in unremitted premiums, but Debtor establishes that it could not bill for those premiums because Frontier failed to perform an audit, Debtor may offset Frontier's claim by $200,000 based on its contractual entitlement to a ten percent commission.

31

Although the negligence claim in Count II duplicates Count I and may be dismissed, I still must address the issue of this Court's constitutional authority to render a final decision under *Stern*. Having determined that Count II simply alleges additional facts to support a breach of contract claim arising from the Agency Agreement upon which the proofs of claim are grounded, I perceive no theory of recovery asserted by Debtor in Count II that will not necessarily be resolved in the process of deciding the validity of Frontier's claims. Therefore, I have the constitutional authority to rule on Count II and to dismiss it for failure to state a claim on which relief may be granted.

### (3). Count III – breach of fiduciary duty

In Count III, Debtor alleges that Frontier breached a fiduciary duty owed to Debtor, which arose out of the fronting services provided in the America's PEO Program. Debtor accuses Frontier of "engag[ing] in self-interested dealings that harmed [Debtor]." Count III fails to allege how the fiduciary relationship was created or to state specific actions that describe Frontier's self-interested conduct. It similarly lacks any description of the specific harm that resulted from Frontier's actions.

Count III cannot survive Frontier's Motion to Dismiss under the *Iqbal* standard set forth at the outset of this Discussion. Debtor's Complaint contains 179 averments regarding Frontier's conduct, but none address how a contract between the parties imposed a fiduciary obligation upon Frontier. The first five paragraphs of Count III allege generally that "Frontier owed [Debtor] a fiduciary duty" and a "duty to give advice" "with the utmost good faith" in which Debtor "reposed confidence and trust." The sixth paragraph avers that "[i]n its dealings with [Debtor], Frontier engaged in self-interested dealings that harmed [Debtor]." The final four

32

paragraphs merely allege that self-dealing constitutes a breach of fiduciary duty, that Debtor has been "subject . . . to arbitrary, unreasonable, unfair, and wanton actions" as a result of that breach, and that it has been "harmed . . . in the form of substantial monetary and non-monetary damages." Because these allegations are conclusory, I am not required to assume that they are true. Therefore, it is appropriate to dismiss this count if I find I have constitutional authority to do so.

Again, the question to be asked under *Stern* is whether this counterclaim would necessarily be addressed in the process of litigating Frontier's claims. Given that the allegations of self-dealing are premised on alleged fiduciary duties Frontier owed to Debtor under the Agency Agreement, Count III would necessarily be resolved in the litigation of the claims Frontier has asserted under the same agreement. Therefore, this Court has constitutional authority to enter a final judgment as to Count III. Because I find that this count fails to state a claim on which relief may be granted under the *Iqbal* standards, Debtor's counterclaim for breach of fiduciary duty is dismissed. However, Count III will be dismissed without prejudice, and Debtor will be granted leave to file an amended complaint.

(4). *Count IV – breach of covenant of good faith and fair dealing*

In Count IV Debtor alleges that Frontier's "overall mismanagement of the Program, failure to guard against the misuse of or fraud against the Program and failure to properly conduct the audits and provide a claim report to [Debtor] . . . materially breached [an] implied covenant" of good faith and fair dealing. Although Count IV is couched in terms of overall mismanagement, its core reference is to the alleged failure to conduct premium audits. Like the prior counts, Count IV's allegations may also be resolved in the litigation of Frontier's claims.

33

Here again, in reviewing the pleadings, the only theory of recovery asserted by Debtor in this count will necessarily be resolved in the process of deciding the validity of Frontier's claim. Accordingly, this Court has constitutional authority to adjudicate Count IV.

*(5). Count V – unjust enrichment*

In Count V Debtor asserts that, to the extent Frontier has a claim against Debtor for unremitted premiums, it should be offset by all claims that Debtor has against Frontier for unpaid commissions on premiums collected directly by Frontier. Debtor alleges that it "provided benefits to Frontier including . . . business acumen and brokerage services" and that Frontier retained these benefits by collecting premiums under the PEO Program that were never "properly reconciled or offset against the premiums demanded from [Debtor] or on which proper commissions due [Debtor] have not been calculated." (Adversary Complaint, ¶¶ 151 - 52 (emphasis added)). The Complaint alleges that Frontier would be unjustly enriched if permitted to retain premiums collected without setting off commissions owed to Debtor against premiums being demanded from Debtor.

Again, I perceive no theory of recovery asserted by Debtor in this Count that will not necessarily be resolved in the process of deciding the validity of Frontier's claim. Therefore, I conclude that this Court has constitutional authority under *Stern* to adjudicate Count V of the Complaint.

*(6). Count VI - promissory estoppel*

Under New York law, a cause of action for promissory estoppel requires the following elements: (1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by the party alleging the existence of the promise; and (3) injury caused by the party's

34

reliance on the promise. *Schwartz v. Miltz,* 909 N.Y.S.2d 729, 731 (N.Y. App. Div. 2010);

*Johnson & Johnson v. American Red Cross*, 528 F. Supp. 2d 462, 463 (S.D. N.Y. 2008).

Recovery under the theory of promissory estoppel does not depend upon the existence of a

contract, but arises out of a breached promise in circumstances under which it is fair to hold

accountable the party making the promise. *Soldiers', Sailors', Marines' and Airmen's Club, Inc.*

*v. Carlton Regency Corp.*, 911 N.Y.S.2d, 774, 784 (N.Y. App. Div. 2010). Therefore, there must

be a promise made independent of promises made within a contract to support a claim for

promissory estoppel.

In the within case, Debtor must set forth in the Adversary Complaint allegations that are

not subsumed in the claims it has asserted for breach of the Agency Agreement. Debtor has

failed to do so. In Count VI, Debtor avers that Frontier "made clear and unambiguous promises"

to Debtor upon which Debtor foreseeably relied. (Adversary Complaint, ¶ 155). Debtor does not

identify the promises to which it refers other than to generally reference prior paragraphs of the

Adversary Complaint. To the extent that the basis for this count can be ascertained from the

pleadings in the Adversary Complaint, it appears to duplicate the claim for breach of contract

and should be dismissed.

### (7). Count VII – negligent and intentional misrepresentation

In Count VII, Debtor charges Frontier with negligent and intentional misrepresentation.

By alleging negligent or intentional misrepresentation, Debtor is alleging fraud, which must

satisfy the heightened pleading requirements of Fed. R. Civ. P 9(b) as incorporated in Fed. R.

Bankr. P. 7009. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b)

35

requires that fraud claims be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vang Chanthavong v. Aurora Loan Services, Inc.*, 448 B.R. 789, 800 (E.D. Cal. 2011) (quoting *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (other citations omitted)).  "The same 9(b) heightened pleading requirement applies to [a] negligent misrepresentation claim since [such a] claim is 'grounded in fraud.'" *Van Chanthavong*, 448 B.R. at 800.

In the matter before me, Count VII only generally describes the party who made the misrepresentation, but it does not describe the "what, when, where and how."  Because Count VII fails to meet the heightened pleading standards of Fed. R. Civ. P. 9(b), it is subject to dismissal by this Court if I find that the allegations of this count would necessarily be resolved in the course of adjudicating Frontier's claims.

The difficulty presented is that without adequate specificity in the pleading, it is impossible to determine whether the allegations of this count will necessarily (or even probably) be resolved in the claim litigation.  Accordingly, Count VII will be dismissed under Rule 9(b) with leave granted to Debtor to file an amended complaint. If an amended complaint is filed, I will have to determine whether I have constitutional authority to enter final judgment on this count.

*(8).  Count VIII – defamation*

In Count VIII, Debtor avers that in the course of the business relationship between the parties, Frontier began a campaign to discredit Debtor and its employees by making defamatory statements about Debtor to third parties. As an example, Debtor states that Frontier "arranged with" an attorney for SURGE Resources, Inc., an America's PEO Program participant, to send a

36

letter to a national regulatory body for the insurance industry in which the attorney blames Debtor for creating a premium dispute between Frontier and SURGE. (Adversary Complaint, ¶ 169 - 78).

Defamation is generally considered to be a "dignitary or nonphysical" personal injury tort. *See United States v. Burke*, 504 U.S. 229, 235 (1992) ("it is judicially well-established that the meaning of 'personal injuries' . . . encompasses both nonphysical as well as physical injuries.") (quoting *Rickel v. Commissioner*, 900 F.2d 655, 658 (3d Cir. 1990)). Section 157(b)(2)(O) of title 28 specifically provides that "personal injury tort" claims must be tried in district court.[21] Before *Stern v. Marshall*, bankruptcy courts in the Third Circuit had held that 28 U.S.C. § 157(b)(5) deprived "bankruptcy courts of the jurisdiction not only to decide but to even hear personal injury tort cases. . . ." *Swarcheck v. Manidis (In re Manidis)*, 1994 WL 250072, *6 (Bankr. E.D. Pa. May 27, 1994); *accord In re Pedro*, 2011 WL 3741504, *5 (Bankr. E.D. Pa. August 24, 2011) (citing *Manidis*); *In re Micro Design, Inc.*, 120 B.R. 363, 367 (Bankr. E.D. Pa. 1990).

Pierce argued in *Stern* that the bankruptcy court lacked jurisdiction to enter final judgment on his defamation claim citing 28 U.S.C. § 157(b)(5). The Supreme Court, however, ruled against Pierce holding that this section is not jurisdictional and was waived when he consented to the resolution of his claim by the bankruptcy court.[22] As discussed above, the Supreme Court went on to rule that the bankruptcy court lacked constitutional authority to render

---

[21]See footnote 13, *supra*.

[22]The Supreme Court declined to rule on whether defamation was a personal injury tort. *Stern,* 131 S. Ct. at 2606-07 (noting in footnote 4 that there is a "three-way divide" on the question of what constitutes a personal injury tort).

37

final judgment on Vicki's counterclaim for tortious interference because it did not arise under the Bankruptcy Code and was not necessarily resolved in adjudicating Pierce's defamation claim.

Similar considerations apply in the within case. This Court lacks the authority to render final judgment on Debtor's count for defamation because it is a discrete claim both factually and legally from Frontier's claims for breach of contract. Whether this Court should nonetheless hear this matter and render findings of fact and conclusions of law for final determination by the District Court or should abstain will be addressed in the discussion on abstention.

### C. Counterclaims and Setoffs

As referenced in the Factual Background above, Debtor has asserted as counterclaims to Frontier's proofs of claim causes of action identical to the counterclaims it asserted against the Receiver in the New York Federal Litigation. In his decision to abstain from hearing Debtor's counterclaims in deference to the ongoing rehabilitation proceeding in state court, Judge Dolinger examined New York cases and determined that Debtor's demand for unpaid commissions were proper setoffs arising out of the same transaction as Frontier's claim for unremitted premiums. *See Serio I*, 2005 WL 2560390 at *5 ("the New York Court of Appeals appears to have treated claims for withheld premiums and for unpaid commissions in a dispute between a carrier and a broker as reflecting a claim and a set-off.") (citing *Amusement Business Underwriters v. American Int'l Group, Inc.,* 489 N.E.2d 729 (1985)).

In the matter before me, Frontier does not challenge Judge Dolinger's finding on this issue.[23] For purposes of its arguments for staying the Adversary Case in deference to the

---

[23]The "Wherefore" clause of Frontier's Motion to Dismiss/Stay the Counterclaims requests "an Order staying the adjudication of the . . . Counterclaims . . . except to the extent of permitting a set-off for commissions, if any, [Debtor] can demonstrate it is owed." (Frontier

38

receivership proceeding in state court, however, Frontier distinguishes the setoff claims from Debtor's other counterclaims. New York law describes rights of setoff more broadly than as acknowledged by Frontier.[24]

The Agency Agreement provides that its terms are governed by New York law. (*See* Appendix, Section Twenty). New York law recognizes rights of setoff between parties in dispute over mutual debts. *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2nd Cir. 2002). Debts may arise from different transactions, but if the obligations are mutual they may be set off. *Id.* 278 F.3d at 149 (citing *Kemper Reins. Co. v. Corcoran (In re Midland Ins. Co.*), 590 N.E.2d 1186, 1189 n. 2 (1992); *Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.),* 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)(other citations omitted)). "[D]ebts are mutual when they are due to and from the same persons in the same capacity." *D'Urso,* 278 F.3d at 149 (citing *In re Midland Ins. Co.,* 590 N.E.2d 1186, 1192 (1992)).

Thus, if Debtor is able to sustain its burden of proof on the counterclaims, it may be able to set off more than commissions owed on premiums collected directly by Frontier. At this

---

Motion to Dismiss, Docket #574, pp. 7 - 8.)  In the brief it filed in support of its Motion, Frontier reiterates its lack of opposition to litigation of setoffs.  (Frontier Memorandum in Reply, Docket #594, p. 9.)

[24]Section 558 of the Bankruptcy Code provides that "[t]he estate shall have the benefit of any defense available to debtor as against any entity other than the estate. . . ." 11 U.S.C. § 558. The Bankruptcy Courts have recognized that rights of setoff are available to a debtor to offset debts owed to a claimant/creditor in bankruptcy. *Matter of Martin*, 130 B.R. 930, 939 (Bankr. N.D. Ill. 1991) (citing *In re Papercraft Corp.,* 126 B.R. 926 (Bankr. W.D. Pa. 1991); *In re Nasr,* 120 B.R. 855 (Bankr. S.D. Tex.1990)). However, the debtor may claim a right to setoff only to the extent that state law recognizes it. *Matter of Martin*, 130 B.R. at 939 (citing *In re Standard Furniture Co.,* 3 B.R. 527, 531 (Bankr. S.D. Cal. 1980); *see also Butner v. United States,* 440 U.S. 48, 55, (1979) (property interests are created and defined by state law)).

juncture the Court is not able to determine the extent to which Debtor is entitled to exercise its rights of setoff, but the determination of this issue is not required to resolve the Motion before the Court.

### D. Issue Preclusion

In its Motion Frontier asserts that this Court is bound by the injunction entered in connection with the October 15, 2001 Rehabilitation Order as well as the stay of proceedings in Judge Dolinger's October 11, 2005 Memorandum and Order. (Frontier's Memorandum in Reply to Debtor's Opposition to Motion to Dismiss/Stay Counterclaims, Docket #594, p. 2). For the reasons set forth above, this Court has subject matter jurisdiction under title 28 to adjudicate the allowance of claims and counterclaims filed in a bankruptcy case. However, in the process of this adjudication, the Court must consider whether it is precluded from deciding issues previously decided by other courts.[25]

In the course of the New York Federal Litigation, Judge Dolinger issued two Memoranda Opinions containing factual findings and legal conclusions relevant to this matter. In *Serio II*, the Court granted Frontier's request for a preliminary injunction to compel Debtor to deposit $1,491,215.76 into the registry of the court. In the Memorandum Opinion supporting his order for injunctive relief, Judge Dolinger made specific findings about the parties' duties and obligations under the Agency Agreement and made finding concerning alleged breaches of the Agreement by both parties. In the matter before me, Debtor disputes some of Judge Dolinger's findings and seeks to relitigate these issues in the instant adversary case. Not surprisingly,

---

[25]Federal common law principles of issue preclusion apply when a court is examining the preclusive effect of a prior federal court decision. *Burlington Northern R.R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231 (3d Cir. 1995).

40

Frontier argues that the Court's findings in the New York Federal Litigation are entitled to preclusive effect in the instant action.

The legal principles of claim and issue preclusion are related.[26]

> Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim. See Restatement (Second) of Judgments §§ 17, 27, pp. 148, 250 (1980); D. Shapiro, Civil Procedure: Preclusion in Civil Actions 32, 46 (2001).

*New Hampshire v. Maine,* 532 U.S. 742, 748-49 (2001), *quoted in In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002); *see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006). Both claim and issue preclusion bar an action when the basis upon which a claim rests has been litigated previously. *CoreStates Bank, N.A. v. Huls American, Inc.*, 176 F.3d 187 (3d Cir. 1999), *cited in Geruschat v. Ernst & Young, LLP (In re Earned Capital Corp.)*, 331 B.R. 208, 225 (Bankr. W.D. Pa. 2005). In the within action, claim preclusion would not apply because Judge Dolinger did not rule on Debtor's counterclaims. In fact, in *Serio I* Judge Dolinger explicitly stayed the adjudication of the counterclaims in favor of the receivership court. Whether issue preclusion applies, however, requires further examination.

The following four elements are required for issue preclusion to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous

---

[26]In contemporary parlance, *res judicata* is referred to as "claim preclusion" and collateral estoppel is referred to as "issue preclusion." *In re Continental Airlines, Inc.* 279 F.3d 226, 232 (3d Cir. 2002). The Third Circuit has observed that "the preferred usage" of the term *res judicata* "encompasses both claim and issue preclusion." *Venuto v. Witco Corp.*, 117 F.3d 754, 758 n.5 (3d Cir. 1997), *cited in U.S. v. 5 Unlabeled Boxes*, 572 F.3d 169, 174 (3d Cir. 2009).

41

determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp. v. White,* 54 F.3d 187, 190 (3d Cir. 1995) (cited in *Henglein v. Colt Ind. Operating Corp.,* 260 F.3d 201, 209 (3d Cir. 2001)); *see also Szehinskyj v. Att'y Gen. of the U.S.*, 432 F.3d 253, 255 (3d Cir. 2006).

In the matter before me, the allegations contained in the Adversary Complaint and in the counterclaims filed in the New York Federal Litigation are identical. However, Judge Dollinger's decision was rendered in the context of a preliminary injunction hearing, not a trial on the merits. Debtor asserts, therefore, that the issues now before this Court were not "actually litigated." In *Serio II*, Debtor observes, the issue before the court was whether Frontier was entitled to the issuance of a preliminary injunction, which may be entered upon a showing of "the likelihood of success" on the merits and not on the final merits of the claim.

In the Third Circuit, findings of fact and conclusions of law reached in a preliminary injunction hearing generally are not entitled to preclusive effect. *DiLoreto v. Costigan*, 600 F. Supp.2d 671, 688 n. 11 (E.D. Pa. 2009); *see also Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S.P.S.*, 272 F.3d 182, 189 (3d Cir. 2001) (holding that issue preclusion applies when an issue of fact or of law is actually litigated and determined by final judgment). But "if the circumstances make it likely that the findings are 'sufficiently firm' to persuade the court that there is no compelling reason for permitting them to be litigated again," principles of preclusion may be applied even if decided in the context of preliminary relief. *Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency*, 126 F.3d 461, 474 (3d Cir. 1997) (citing *Dyndul v. Dyndul,* 620 F.2d 409, 411-12 (3d Cir.1980); *accord Commodity Futures Trading Comm'n v. Bd. of Trade,* 701 F.2d 653, 657 (7th Cir. 1983) (findings made in preliminary injunction decisions may have a

42

preclusive effect "if the circumstances make it likely that the findings are accurate [and] reliable"); 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 4434, § 4445 (other citations omitted); s*ee also McTernan v. City of York*, 577 F.3d 521, 530-31 (3d Cir. 2009) (finding that when the issues in the two proceedings are identical and the parties had a full opportunity to present their arguments at the preliminary injunction hearing, a court's findings and conclusions on the preliminary injunction may have a preclusive effect.)

In *Hawksbill*, the Third Circuit advised that a court must examine a variety of factors to determine whether findings are "sufficiently firm" to be afforded preclusive effect, including "'whether the parties were fully heard, whether the court filed a reasoned opinion, and whether that decision could have been, or actually was appealed.'" *Hawksbill*, 126 F.3d at 474 n.11 (citing *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991)); *see also Pa. Public Interest Research Group, Inc. v. PH Gladfelter*, 128 F. Supp.2d 747, 756 (M.D. Pa. 2001) (citing *Hawksbill*) (stating that where party seeks to invoke issue preclusion based on prior preliminary injunction order, the issues are "whether the parties were fully heard, whether the court filed a reasoned opinion, and whether the decision could have been or actually was appealed"). Accordingly, I conclude that it is possible that Debtor may be precluded from litigating some of the issues previously decided by Judge Dolinger in *Serio II* if the findings were "sufficiently firm" and if the four-part test set forth in *Raytech* is satisfied.

### 1. Issues subject to preclusion

In his decision requiring Debtor to escrow certain premium payments, Judge Dolinger reached several legal conclusions. Among them were: (1) Frontier is entitled to equitable relief

43

since it asserted rights in a specific fund; (2) Frontier was likely to succeed on the merits; (3) there were "serious issues going to the merits of the claim"; (4) Frontier could be irreparably harmed if the injunction were not issued; and (5) the balance of the hardships favored Frontier. *Serio II*, 2005 WL 3642217 at *8 -19.

Judge Dollinger also made several factual determinations. While the precise amount Debtor owed to Frontier in 2005 was not determined in the *Serio II* decision, Judge Dollinger did make several firm findings of fact and conclusions of law. He determined that "with respect to the . . . insureds under the PEO Program that were approved by Frontier, [Debtor] received $3,651,935.79 in premiums and remitted to Frontier only $597,000.00." *Serio II*, 2005 WL 3642217 at *4. He further recognized that Debtor held the premiums in trust as provided in the Agency Agreement and as required under state law. "Given the terms of the Agency Agreement and the New York Insurance Law, [Debtor's] failure to transmit these funds (less commissions) to Frontier seems plainly to have violated [Debtor's] obligations under the Agency Agreement and the Insurance Law." *Id.* at *10. As to Debtor's argument that the Agency Agreement was amended to permit Debtor to send premiums to Congressional Re, Judge Dolinger determined that this argument was "baseless, " citing the requirements that modifications to the agreement were required to be in writing and accepted by both parties. Judge Dolinger found no support whatsoever for Debtor's argument that it was authorized to transfer premiums to Congressional Re. *Id.* at *12. Judge Dolinger noted that the "implausibility" of the purported amendment to the Agency Agreement was "underscored by the fact that there [was] no indication in the record the [Debtor] subsequently apprised Frontier of the fact that it was sending money to Congressional Re . . . , an accounting obligation that [Debtor], as fiduciary, bore." *Id* at *11. However, Judge

44

Dolinger did leave the door open for Debtor to establish some other basis for excusing Debtor's failure to remit all premiums received minus commissions, which could include breaches to the Agency Agreement allegedly committed by Frontier. *Id.* at *10. He also found support for Debtor's allegation that as to the allocation of responsibility for the performance of audits, the burden was shifted from Debtor to Frontier to perform this task.[27]

### 2. Findings and conclusions "sufficiently firm" to be afforded preclusive effect

The transcript of the hearing in *Serio II* has not been included as part of the record before me. Nonetheless, it is not difficult to discern that the parties had ample opportunity to state and support their positions prior to the issuance of the injunction. The docket in the proceeding includes numerous documents in support of Frontier's motion seeking injunctive relief, including legal memoranda from both sides, numerous sworn "declarations" by witnesses, and products of discovery, including answers to interrogatories and requests for production of documents. In support of his conclusions, Judge Dolinger issued a 58-page Memorandum and Order that made numerous references to the record. On January 24, 2006, Debtor appealed the *Serio II* decision after the filing of the instant bankruptcy case on January 16, 2006. On March 10, 2006, the appeal was dismissed, apparently due to Debtor's failure to prosecute the matter. Therefore, I

---

[27] In *Serio II,* Judge Dolinger determined that "[t]he cited change, which is reflected in a writing from Frontier (DX 20 at p. 3; *see* DX 19), *altered the prior contractual arrangement*, under which BDS was responsible for conducting such audits. On its face, however, that written notification by Frontier did not purport to alter the requirement that defendant collect premiums as due and transmit them, less commissions, to Frontier. . . . Defendant entirely fails to demonstrate any evidentiary basis for concluding that the assumption by Frontier of the auditing function eliminated the obligation of BDS to account for and remit the proceeds of premium payments." *Serio II*, 2005 WL 3642217, *11 (emphasis added).

45

find that if the requirements of the *Raytech* test are satisfied, Judge Dolinger's decision in *Serio II* is sufficiently firm to afford preclusive effect to several of his findings.

### 3.  Application of <u>Raytech</u> test

The Third Circuit held in *Raytech* that issue preclusion applies if: "(1)  the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp.*, 54 F.3d at 190.  In order to determine whether Frontier was entitled to injunctive relief, Judge Dolinger was required to address several issues and underlying facts also germane to the current proceeding. The amount of premiums collected by Debtor from PEO clients and the amount turned over to Frontier were actually litigated in the New York Federal Litigation in which both parties were fully represented. Likewise, the fiduciary capacity in which Debtor held these funds was an issue before Judge Dolinger, as it is here.  Whether the Agency Agreement was amended such that Debtor was authorized to transfer funds to Congressional Re was a critical issue considered by Judge Dolinger when he concluded that it was appropriate to issue a mandatory injunction requiring that all premiums received by Debtor and remaining in its possession should be held in escrow. In the preliminary injunction hearing these issues were actually litigated and were necessary to his decision granting injunctive relief.

For these reasons, I find that the decision was sufficiently firm to afford preclusive effect as to Judge Dolinger's findings that Debtor received $3,651,935.79 in premiums held in a fiduciary capacity and that it remitted to Frontier only $597,000.00. Further, I also find that preclusive effect should be afforded to Judge Dolinger's determination that the Agency

46

Agreement was not amended to authorize Debtor to transfer funds received as premium payments to Congressional Re, but that it was amended to relieve Debtor from conducting audits specified under the Agency Agreement and this responsibility was transferred to Frontier.

E. *Application of the Rooker-Feldman doctrine*

In the matter before me, Frontier argues that *Rooker-Feldman* doctrine prohibits this Court from hearing Debtor's counterclaims in this matter. The *Rooker-Feldman* doctrine is derived from two Supreme Court cases – *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415-16 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 483-84 (1983). The doctrine stands for the proposition that lower federal courts may not sit as courts of appeal for state court judgments. *See Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1496 (5th Cir. 1993) ("The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court [for state court proceedings].") *Rooker-Feldman* is a narrow doctrine and "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The weakness in Frontier's argument is that there is no state court judgment involved in this case. There is the injunction issued by the receivership court, but there is no evidence in the record to suggest that the state court has addressed any of the issues present in this case. The preliminary injunction is not subject to *Rooker-Feldman* because it is the decision of a federal court. Therefore, *Rooker-Feldman* has no applicability in the within case.

47

*F. Abstention*

    *1. Mandatory Abstention*

If a party files a timely motion in a proceeding based on a claim under state law that is related to a case under title 11 and the only basis for jurisdiction over the cause of action is the filing of the bankruptcy petition, abstention is required if the matter can be timely adjudicated in state court. 28 U.S.C. § 1334(c)(2).

By the terms of the statute, mandatory abstention does not apply to core proceedings. *In re Exide Technologies,* 544 F.3d 196, 203 (3d Cir. 2008); *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1206 (5th Cir. 1996), *quoted in In re Seven Fields Development Corp.*, 505 F.3d 237, 251 (3d Cir. 2007) ("Mandatory abstention applies only to non-core proceedings – that is, proceedings 'related to a case under title 11, but not arising under title 11, or arising in a case under title 11.'"). Because the adjudication of a counterclaim filed in response to a creditor's claim is core proceedings under 28 U.S.C. § 157(a), mandatory abstention is inapplicable.

    *2. Discretionary abstention*

A bankruptcy court has authority to abstain from hearing a particular proceeding, whether the matter is core or non-core. 28 U.S.C. § 1334(c)(1); *see Siragusa v. Siragusa (In re Siragusa),* 27 F.3d 406, 408–09 (9th Cir. 1994) (bankruptcy court did not abuse its discretion by deferring to the state court as to whether payments to creditor-wife were dischargeable) (other citations omitted). But as I have noted in prior cases, "abstention is a narrow exception to the duty of a court to adjudicate a controversy before it." *In re 19-21 N. George, Inc.*, Adv. No. 1:10-ap-000432MDF, 2011 WL 1841556, *3 (Bankr. M.D. Pa. May 30, 2011) (citing *Gwynedd Properties Inc. v. Lower Gwynedd Township,* 970 F.2d 1195, 1199 (3d Cir.1992) (other citations

Case 1:11-ap-00160-MDF   Doc 25   Filed 02/02/12   Entered 02/02/12 11:51:11   Desc
Main Document     Page 48 of 57

omitted). Discretionary abstention is an "extraordinary remedy" not frequently utilized by bankruptcy courts. *In re 19-21 N. George*, at *3 (citation omitted). Generally, it is reserved for: (1) matters in which difficult, uncertain issues of state law or those in which the state has a unique interest are presented; (2) matters in which the proceeding has been removed from state court and/or there is a parallel state court action pending; (3) matters in which the proceedings principally involve claims asserted by or against non-debtors; and (4) matters in which some other truly extraordinary aspect is present. *Id.* at *4.

Courts in this Circuit often apply a twelve-factor test when deciding whether to abstain from hearing matters over which they have jurisdiction. These factors include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with the enforcement left to the bankruptcy court; (9) the burden on the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. *See Republic Reader's Service, Inc. v. Magazine Service Bureau, Inc. (In re Republic Reader's Service),* 81 B.R. 422, 426–29 (Bankr. S.D. Tex. 1987) (other citations omitted). Evaluating the twelve factors is not a mathematical formula, some

49

factors may predominate based on the circumstances of the case. *Trans World Airlines, Inc. v. Karabus Corp.,* 196 B.R. 711, 715 (Bankr. D. Del. 1996).

Three counts of the Adversary Complaint are sufficient to survive Frontier's motion to dismiss and are within this Court's constitutional authority to enter final judgment (Counts I, IV, and V). Count II will be dismissed because it duplicates Count I. Counts III and VII will be dismissed subject to leave to Debtor to file an amended complaint addressing the deficiencies identified in this Opinion. This Court does not possess the constitutional authority to enter final judgment on Count VIII, but otherwise may hear Debtor's defamation claim and issue findings of fact and conclusions of law for determination by the District Court. I will examine the *Republic Reader's Service* factors to determine whether discretionary abstention is appropriate for Counts I, IV, V, and VIII.

### a. Factors disfavoring abstention

Factors (1), (6), (8), and (11), as cited above, militate against abstention. The amended schedules filed by Debtor on March 29, 2006 show personal property with an aggregate value of $732,562.54 consisting of $314,611.75 in "aged receivables," $312,376 for "Sums advanced for professional fees (Frontier Litigation)," and $7,490.50 described as "Credit/Pennsylvania Department of Revenue." Amended schedule B does not include the value of the counterclaims asserted by Debtor against Frontier in this adversary proceeding, the aggregate value of which is at least $800,000 based on Debtor's assertion of damages for lost commissions. Thus, if Debtor's counterclaims for damages attributable to Frontier's alleged breach of the Agency Agreement and the implied covenant of good faith and fair dealing as well as the claim for unjust

50

enrichment are meritorious, the within cause of action is Debtor's most significant asset.[28]   If I abstain from hearing Debtor's counterclaim on these counts in deference to the receivership court, the efficient administration of Debtor's estate[29] will be hampered by the schedule of the state court, whose duty is to efficiently administer Frontier's estate, but not Debtor's.   Thus, Factor 1 disfavors abstention.   Similarly, Debtor's counterclaims are integral to the main bankruptcy case as contemplated by Factor 6.   Debtor's success or failure in prosecuting its case will determine whether it will be able to propose a Chapter 11 plan.   Accordingly, Factor 6 disfavors abstention.   The adjudication of Frontier's claims clearly is a core matter.   To the extent that Debtor's counterclaims would necessarily be resolved in the claims allowance process, it is a more prudent use of judicial resources to resolve these matters in the same proceeding. However, as to Count VIII the same considerations do not apply. This Court may hear the testimony and issue findings of fact and conclusions of law on Debtor's claim for defamation, but final judgment must be determined by the District Court. Therefore, the same efficiencies will not be realized if I hear Count VIII. As to factor 11, there has been no jury demand in the adversary case.   Accordingly, this factor disfavors abstention.

---

[28]Debtor has not quantified the damages alleged for defamation in Count VIII.

[29]Despite the age of Debtor's bankruptcy case, no plan of reorganization has yet been filed, primarily because the counterclaims asserted in the instant adversary case constitute Debtor's primary asset according to the schedules.  Without a determination of the value of those counterclaims, it is not feasible for Debtor to propose a Plan.  If litigation of the counterclaims is relegated to state court, this Court will relinquish what little control it has over the timetable for the proposal of a Plan.

51

### b. Factors favoring abstention

Factors (2), (3), (4), (5), and (10) favor abstention. The primary factor supporting abstention is the lack of substantive federal issues in this case. Both the claims and counterclaims arise from state law. Additionally, specialized issues of insurance law are intertwined with issues of contract law, which support abstention. However, the primary issues to be addressed by this court are well-settled issues of state contract law. To the extent that the case involves an understanding of the insurance industry practices, the law may well be settled, but it is clearly not within the general expertise of a bankruptcy court.[30] The existence of a related proceeding in a state court with the requisite expertise and authority to decide this matter also favors abstention. As to the final two factors favoring abstention, there is no jurisdictional basis for hearing state law claims other than 28 U.S.C. § 1334, and the filing of the bankruptcy case after the entry of the mandatory injunction suggests forum shopping by Debtor.

### c. Neutral factors

Three factors are neutral in the abstention analysis. Although the substance of the counterclaims are grounded in state law, the resolution of those claims will have a substantive effect on the bankruptcy estate, the administration of which is a core substantive matter for this Court. Therefore, the seventh factor is neutral. As to the ninth factor, the Court does not find that conducting trial on the Adversary Complaint would contribute disproportionately to the current burden of the Court's docket. Therefore, this factor also is neutral. Finally, as to the

---

[30]At least one Circuit Court of Appeals has held that "difficult state law questions alone are not enough" to justify abstention by a bankruptcy court in favor of a state insurance receivership action. *Sevigny v. Emp'rs Ins. of Wausau*, 411 F.3d 24, 29 (1st Cir. 2005). Admittedly, in the matter before me more factors than this single one favor abstention.

52

twelfth factor, there are no third parties against whom claims are being made in the adversary case, so this factor is neutral.

### d. Summary of factors

Although four factors disfavor abstention while five favor it and three are neutral, the Court is not required to give equal weight to all factors. Based on the analysis above, I conclude that the factors disfavoring abstention for all counts except Count VIII are more compelling in this case. The Court finds that efficient administration of the bankruptcy estate will be seriously hampered, especially in a case in which a plan has not been confirmed, if I were to abstain from hearing those claims for which a bankruptcy court has the constitutional authority to enter a final decision.[31]

By filing a proof of claim, Frontier voluntarily submitted to the equitable power of the bankruptcy court to allow or disallow its claims. Although the claims are based on state contract law, the matters are neither complex or unsettled, nor have proceedings been commenced in the receivership court to resolve the claims. Therefore, comity is not offended by these matters being resolved in the bankruptcy court.

As to Count VIII, I find that the weight of the factors tips in favor of abstention. As previously discussed, the defamation claim does not arise from the same set of facts as other

---

[31]The importance of the factors concerning the degree of relatedness or remoteness of the proceeding to the main bankruptcy case and the stage of the administration of the bankruptcy case is illustrated by comparing the within bankruptcy case with *In re FairPoint Communications, Inc.*, ___ B.R. ___, 2012 WL 13690 (Bankr. S.D.N.Y. January 4, 2012). In *FairPoint*, the bankruptcy judge abstained to permit the state courts to conclude their adjudication of certain tax claims. A plan had been confirmed and the claim at issue represented "only a tiny fraction of the total claims," which allowed the court to find that the claims were remote from the bankruptcy proceedings. *FairPoint,* 2012 WL 13690 at *9. In the within case, the determination of Frontier's claim is a central issue in the reorganization process.

53

claims set forth in the Adversary Complaint. Further the same considerations of judicial economy are not present because *Stern* requires that these issues be finally determined by the District Court on findings of fact and conclusions of law of this Court. Therefore, I will abstain from hearing Count VIII, but deny abstention on Counts I, IV, and V.

### V. Conclusion

Frontier's Motion to dismiss or stay the litigation of Counts I, IV, and V of Debtor's Adversary Complaint will be denied. Counts II and VI will be dismissed because they duplicate the claims of Count I. Count III will be dismissed for failure to state a claim on which relief can be granted, but Debtor will be granted leave to amend the Adversary Complaint to address the deficiencies identified in this Opinion. Count VII will be dismissed for failure to plead fraud with sufficient specificity, but Debtor will be granted leave to amend the Adversary Complaint to comply with the requirements of Rule 9(b). Frontier's Motion as to Count VIII will be granted to the extent that the Court will abstain and dismiss the count.

An appropriate Order will be entered.

**By the Court,**

*Mary D France*

Chief Bankruptcy Judge

Date: February 2, 2012

# APPENDIX

## SECTION FOUR
### GENERAL DUTIES OF AGENT

[Debtor] will:

*\*\*\**

B.  Supervise, direct and implement the production, premium collection, accounting, statistical, and other work necessary or incidental to the insurance business written under this Agreement through personnel competent to do so.

C.  Establish and maintain such books and records in a manner required by [Frontier] to record the transaction pursuant to this Agreement.

*\*\*\**

## SECTION FIVE

### UNDERWRITING

C. [ ] [Debtor] shall provide a monthly account to [Frontier] within fifteen (15) days after the end of the month for which the account is given.

*\*\*\**

## SECTION SEVEN

### CLAIMS ADMINISTRATION, SETTLEMENT, DRAFT
### AUTHORITY AND ISSUANCE

A. [Debtor], unless otherwise provided under separate agreement, shall not process, adjust, settle or pay any claims under policies underwritten or delivered by [Debtor] pursuant to this Agreement, nor shall [Debtor] commit [Frontier] to pay any claim.

*\*\*\**

## SECTION EIGHT

### RECEIPT OF FUNDS/ACCOUNTS/REPORTS

A.  Accounts of money due [Frontier] on the business written by [Debtor] with [Frontier] shall be paid, not later than forty-five (45) days after the close of the month in which the premium is payable;

B. [Debtor] is trustee with respect to all money it receives in connection with this Agreement.  All premiums collected by [Debtor] are to be held in a fiduciary capacity for [Frontier] in an account . . . satisfactory to [Frontier], and are the property of [Frontier] and Agent shall pay [Frontier] for accrued premium [sic] whether collected or not. The burden of collection of such premium shall be borne by [Debtor]. [Debtor] has no interest in the premiums collected by it and shall make no deductions therefrom before accounting for and paying the same to [Frontier], except for the compensation authorized in Section Fifteen.  [Debtor] shall not make personal use of such premium funds either in paying expenses of agent or otherwise.

*\*\*\**

## SECTION FIFTEEN

### COMPENSATION

55

Subject to compliance by [Debtor] with the terms and conditions of this Agreement, [Frontier] will allow [Debtor] as full compensation for all services . . . 10% of annual Gross Written Premium for the Program.

\*\*\*

## SECTION EIGHTEEN

## AUDIT RIGHTS

A.  In order to assure itself of [Debtor's] compliance with the terms of this Agreement, [Frontier], upon reasonable notice to [Debtor], shall have the right to conduct audits of the books and records of [Debtor] . . . .

B.  Upon reasonable notice, [Debtor] shall permit . . . [Frontier] to review the operations of [Debtor] . . . in order to evaluate the quality and accuracy of [Debtor's] employees and operations.

\*\*\*

## SECTION TWENTY

## LAWS GOVERNING JURISDICTION

This Agreement shall be governed by the laws of the State of New York, the courts of which State shall have exclusive jurisdiction over both parties as respects any dispute arising out of the interpretation or enforcement of this Agreement.

\*\*\*

## SECTION TWENTY-TWO

## GENERAL DUTIES OF [Frontier]

\*\*\*

[Frontier] will:

\*\*\*

D.  Make all underwriting statistical filings . . . and collect all statistical and underwriting data applying to the business written pursuant to this Agreement.

\*\*\*

## SECTION TWENTY-FIVE

## TERMINATION

I.  In the event of termination of this Agreement, any business written hereunder and remaining with [Frontier] shall be permitted to continue to normal expiration . . .

\*\*\*

## SECTION THIRTY-THREE

## MODIFICATION

This Agreement may only be revised and/or modified in writing and must be accepted by both [Frontier] and

56

[Debtor].  No other change, modification, addition or deletion to any portion of this Agreement will be valid or binding upon either [Frontier] or [Debtor].  Neither a representative of [Frontier] or [Debtor] has authority to waive any of the provisions of this Agreement or to modify or change any of its terms and conditions, except as provided herein.